Kelvin DANIELS; Poseidon Baskin; Djibril Toure; Hector Rivera; Raymond Ramirez; Kahil Shkymba; Bryan Stair; Tiara Bonnner; Theron McConneyhead; and Horace Rogers, individually and on behalf of a class of all others similarly situated, Plaintiffs,

v.

THE CITY OF NEW YORK; and Mayor Rudolph Giuliani; New York City Police Commissioner Howard Safir; New York City Police Officers John Does ## 1–500; New York City Police Officer Anthony Curtin; New York City Police Sergeant Peter Mante; and New York City Police Officer Walter Doyle; in their individual and official capacities, Defendants.

No. 99 CIV. 1695 (SAS).

United States District Court, S.D. New York.

Jan. 25, 2001.

Adam D. Gale, Alison L. LaCroix, Debevoise & Plimpton, Nancy Chang, William H. Goodman, Center for Constitutional Rights, Jonathan C. Moore, Law Offices of Jonathan C. Moore, Robert F. Van Lierop, Van Lierop, Burns & Bassett, New York City, for Plaintiffs.

Lisa S.J. Yee, Ingrid Box, Linda Donahue, Assistant Corporation Counsel, Corporation Counsel for the City of New York, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. INTRODUCTION

In this civil rights action, the named plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek relief for alleged constitutional violations by a unit of the New York City Police Department known as the Street Crime Unit (the "SCU").[1] It is alleged that in high crime areas, SCU officers have been repeatedly conducting stops and frisks of individuals without the reasonable articulable suspicion required by the Fourth Amendment. Cmplt ¶¶ 4, 44. Rather, SCU officers have improperly used racial profiling, not reasonable suspicion, as the basis for the stops and frisks. *Id.* The victims of such racial and/or national origin profiling are principally Black and Latino males. *Id.*

The named individual plaintiffs are ten Black and Latino men between the ages of 23 and 37 years old who reside in the Bronx, Brooklyn, Manhattan, and the City of Rochester. *Id.* ¶¶ 12–21. Each plaintiff alleges that he has been stopped and frisked by police officers believed to be members of the SCU without reasonable suspicion and on the basis of his race and national origin. *Id.* ¶¶ 68–97. Each claims to have sustained injuries as a result of these encounters including, but not limited to, fear of the possibility of future stops and frisks. *Id.* ¶ 98.

---

1. The SCU is an elite squad of police officers whose mission is to interdict violent crime in New York City and, in particular, remove illegal firearms from the streets. *See* Third Amended Class Action Complaint for Declaratory and Injunctive Relief and Individual Damages ("Cmplt") ¶ 43.

Plaintiffs are now seeking class certification under Federal Rule of Civil Procedure 23 solely for the purpose of obtaining declaratory and injunctive relief.[2] The proposed class consists of:

> All persons who have been or will be subjected by officers of the Street Crimes [sic] Unit ("SCU") of the New York City Police Department ("NYPD") to defendants' policy, practice and/or custom of illegally stopping and/or frisking persons within the City of New York:
>
> (a) in the absence of the reasonable articulable suspicion of criminal activity that is required by the Fourth Amendment to the United States Constitution and Article 1, Section 12, of the New York State Constitution, including, but not limited to, persons who have been stopped, or stopped and frisked,
>
> (b) in a manner that discriminates on the basis of race and/or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 1, Section 11, of the New York State Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) et seq.

See Affirmation of Adam D. Gale, plaintiffs' attorney, sworn to November 27, 2000, ¶ 2. For the following reasons, the proposed class is certified, subject to reconsideration at a later date. See Fed.R.Civ.P. 23(c)(1).

## II. CLASS ALLEGATIONS [3]

Plaintiffs allege that the SCU reported over 18,000 stops and frisks in 1997 with a 50% increase in 1998. Cmplt ¶ 47. Plaintiffs cite *The New York City Police Department's "Stop and Frisk" Practices: A Report to the People of the State of New York From the Office of the Attorney General* (December 1, 1999) ("Attorney General's Report") for their analysis of over 19,000 stops made by the SCU between January 1998 and March 1999.[4] See Plaintiffs' Memorandum of Law in Support of Motion for Class Certification at 6. The Attorney General reported that 62.7% of these stops involved blacks and 27.5% involved Latinos. *Id.* at 6–7. Furthermore, the Attorney General found that reasonable suspicion was not articulated in 23.2% of the stops documented by the SCU. See Plaintiffs' Reply Memorandum of Law in Support of Motion for Class Certification ("Reply Mem.") at 5. Plaintiffs argue that these statistics satisfy the numerosity requirement. See *infra* Part III.C.

Plaintiffs further argue that joinder is impracticable not only because of the number of

---

2. In addition to a class-wide judgment declaring the SCU's policy, practice and/or custom of suspicionless stops and frisks to be unconstitutional, plaintiffs seek an Order:

(i) enjoining the SCU from continuing its policy, practice and/or custom of suspicionless stops and frisks;

(ii) enjoining the SCU from continuing its policy, practice and/or custom of conducting stops and frisks based on racial and/or national origin profiling;

(iii) enjoining the use of formal or informal productivity standards or other de facto quotas for arrests and/or stops and frisks by SCU officers;

(iv) requiring the City, Safir and Giuliani to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the SCU's policy, practice and/or custom of suspicionless stops and frisks;

(v) requiring the City, Safir and Giuliani to institute and implement more effective methods to screen applicants to the SCU, including the use of psychological testing and evaluations;

(vi) requiring the City, Safir and Giuliani to deploy SCU teams with appropriate and adequate supervision;

(vii) requiring the City, Safir and Giuliani to institute and implement appropriate measures to ensure compliance with departmental directives that SCU officers complete UF–250's on each and every stop and frisk they conduct....

Cmplt WHEREFORE Clause, ¶ b.

3. Unless otherwise indicated, the class allegations are taken from plaintiffs' Third Amended Complaint and are assumed true for purposes of this motion. See *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

4. Surprisingly, plaintiffs did not include the Attorney General's report as one of their numerous exhibits to the affidavits submitted in support of class certification. Accordingly, plaintiffs are directed to submit this Report to the Court forthwith so that the figures cited by plaintiffs can be independently verified.

stops but also because "many members of the class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court." Cmplt ¶ 34. Many class members cannot afford an attorney and are fearful of retaliation by the SCU. *Id.* Common questions of law and fact affect these class members and the named plaintiffs including: "(1) whether the SCU engages in a policy, practice and/or custom of conducting stops and frisks in the absence of reasonable suspicion of criminal conduct; and (2) whether the SCU engages in racial and/or national origin profiling in targeting the individuals it stops and frisks; (3) whether the SCU, incidental to such stops and frisks, conducts searches and seizures and uses excessive force in violation of the Fourth Amendment; (4) whether the City, Safir and Giuliani have failed to adequately and properly screen, train, supervise, monitor and discipline SCU officers, and whether those failures have caused the constitutional violations inflicted by SCU officers against class members; and (5) whether the City, Safir and Giuliani have encouraged, sanctioned and failed to rectify unconstitutional stops and frisks by members of the SCU, and whether such acts and omissions have caused constitutional violations by SCU officers against class members." *Id.* ¶ 35. Furthermore, the named plaintiffs allege that their claims are typical of those of the class in that they have been and may again be the victims of suspicionless stops and frisks by the SCU. *Id.* ¶ 36.

## III. DISCUSSION

### A. Rule 23: Requirements and Objectives

 Class actions are a procedural mechanism that conserve " 'the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.' " *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155,

102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)) (alteration in original). Class actions also "reduce the threat of repetitive litigation, … prevent inconsistent resolution of similar cases, and … provide an effective means of redress for individuals whose claims are too small to make it economically viable to pursue them in independent actions." *In re A.H. Robins Co., Inc.,* 880 F.2d 709, 732 (4th Cir.1989). Judge Robert L. Carter of this Court has succinctly stated the requirements for a class action.

On review of a motion for class certification under Rule 23, F.R. Civ. P., the court assumes that the allegations raised in the plaintiff's complaint are true, and plaintiff bears the burden of establishing that the class meets the Rule 23 requirements. In specific, plaintiff must establish that the class meets all of the requirements of Rule 23(a), F.R. Civ. P., and show that the class meets the requirements of one of the subsections of Rule 23(b), F.R. Civ. P. A court may certify a class only if it is satisfied after a "rigorous analysis" that the Rule 23 requisites have been satisfied; however, it will not consider the merits of the plaintiff's claims in its analysis.[5] Moreover, the law in the Second Circuit favors the liberal construction of Rule 23, and therefore courts may exercise broad discretion when they determine whether to certify a class.

*Selby v. Principal Mut. Life Ins. Co.,* 197 F.R.D. 48, 54 (S.D.N.Y.2000) (internal quotation marks and citations omitted, footnote added).

The following four prerequisites are common to any class action: "(1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the

5. While Rule 23 does not authorize a court to inquire into the merits of a suit, the court may go beyond the pleadings and consider the range of proof necessary to support class certification. *See Falcon,* 457 U.S. at 157, 160, 102 S.Ct. 2364. Furthermore, the court has an independent duty

to determine the propriety of class certification and is not limited to arguments made by the parties. *See Anderson v. Cornejo,* No. 97 Civ. 7556, 2000 WL 286902, at *3 (N.D.Ill. Mar. 10, 2000).

claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation]." Fed. R.Civ.P. 23(a). Moreover, because plaintiffs are moving under Rule 23(b)(2), they must also show "that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

The Third Circuit has described the objectives underlying Rule 23(a) as follows:

The requirements of Rule 23(a) are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances. While numerosity addresses the first of these concerns, i.e., necessity, the last three requirements help determine whether the class action can be maintained in a fair and efficient manner. Class treatment makes no sense if there are no common issues; the trial court would gain nothing but logistical headaches from the combination of the cases for trial. Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class. Adequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class.

*Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 55 (3rd Cir.1994).

With regard to Rule 23(b)(2), it has been said that "[w]hen a suit seeks to define the relationship between the defendant(s) and the world at large, ... [Rule 23](b)(2) certification is appropriate" and is especially appropriate where a plaintiff seeks injunctive relief against discriminatory practices by a defendant. *Weiss v. York Hosp.,* 745 F.2d 786, 811 (3d Cir.1984). *See also Marisol A. by Forbes v. Giuliani,* 929 F.Supp. 662, 692 (S.D.N.Y.1996) ("Rule 23(b)(2) is designed to assist and is most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief."), *aff'd,* 126 F.3d 372 (2d Cir.1997). In fact, the Notes of the Advisory Committee on Civil Rules state that examples of Rule 23(b)(2) actions include civil rights actions "where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." Fed.R.Civ.P. 23(b)(2) advisory committee's note.

In addition to the requirements of Rule 23(a) and (b)(2), the proposed class must also meet a requirement not contained within the express provisions of Rule 23—the class must be sufficiently definite. *See Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981) ("It is axiomatic that for a class action to be certified a 'class' must exist."). Thus, a proposed class must be clearly defined so that it is "administratively feasible for a court to determine whether a particular individual is a member." *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y.1983) (quoting 7 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1760 at 581 (1972)). The court must be able to make this determination without having to "answer numerous fact-intensive questions." *Williams v. Glickman,* No. 95 Civ. 1149, 1997 U.S. Dist. LEXIS 1683, at *13 (D.D.C. Feb. 14, 1997).

## B. Specificity

Defendants claim that because class members are defined as those who have been subjected to suspicionless stops and frisks, determination of class membership will inevitably require individualized assessments of the merits of each putative class member's claim. This is allegedly so because the "reasonableness of an officer's suspicion must be tested against the backdrop of the totality of circumstances surrounding a challenged stop." *United States v. Stone,* 73 F.Supp.2d 441, 446 (S.D.N.Y.1999), *aff'd,* 225 F.3d 647 (2d Cir.2000). Arguably, then, this Court would be required to first determine whether a person's constitutional rights had actually been violated in order to determine whether that person is a class member. Defendants point out that such "mini-trials," evaluating the merits of individual claims at the class

certification stage, have been expressly forbidden by the Supreme Court. *See Eisen,* 417 U.S. at 177–78, 94 S.Ct. 2140.

Defendants cite a number of cases in support of their argument. For example, in *Universal Calvary Church v. City of New York,* 177 F.R.D. 181 (S.D.N.Y.1998), class certification under Rule 23(b)(3) was denied. In denying certification, the court stated:

> Each plaintiff's claim turns largely on its individual facts. For example, whether a particular police officer employed excessive force against a particular plaintiff requires a determination of exactly how much force was used in dealing with that plaintiff. The amount of force utilized undoubtedly varied from plaintiff to plaintiff and what might be excessive in one case might be justified in another.
>
> \* \* \*
>
> Moreover, the damages suffered by the plaintiffs will vary depending on such factors as the level of force used in each instance, . . . .

*Id.* at 183–84. Defendants cite several other Rule 23(b)(3) cases. *See, e.g., Luedke v. Delta Airlines,* 155 B.R. 327, 330 (S.D.N.Y.1993) ("The task of evaluating the reasonableness of each claimant's belief that he or she was promised employment and could rely on such a promise has the potential to embroil the Court in thousands of fact-finding inquiries."); *Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403 (E.D.Pa.1995) ("Here, defining the purported class as 'all residents and businesses who have received unsolicited facsimile advertisements' requires addressing the central issue of liability to be decided in the case. Determining a membership in the class would essentially require a mini-hearing on the merits of each case.").

Defendants also cite several cases where a class was not certified because plaintiffs primarily sought monetary damages. *See, e.g., Paciello v. Unum Life Ins. Co. of Am.,* 188 F.R.D. 201, 205 (S.D.N.Y.1999) ("the real relief sought by the putative members of the class—money—can only be obtained in individual actions following inquiries into the individual situations of the allegedly disabled insureds."), *aff'd,* 213 F.3d 626 (2d Cir.2000);

*Glickman,* 1997 U.S. Dist. LEXIS 1683, at \* 31 (certification under (b)(2) denied where suit was essentially to recover damages, not to obtain injunctive relief).

Defendants fail to fully appreciate the distinction between an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3).

> There is a significant distinction between certification of an injunctive class pursuant to Rule 23(b)(2), and certification of a damage class pursuant to Rule 23(b)(3). When an action is certified under Rule 23(b)(3), class members are entitled to notice of the pendency of the action and may elect to "opt out" of the class and thereby not be bound by the judgment rendered in the class action. When a class action is certified under Rule 23(b)(2), however, all persons comprising the class become mandatory members. In other words, all those who come within the description in the certification become, and must remain, members of the class because no opt-out provision exists.

*Wilson v. Tinicum Township,* No. 92 Civ. 6617, 1993 WL 280205, at \*8 (E.D.Pa. July 20, 1993) (internal quotation marks and citations omitted).

The absence of a claim for money damages eliminates the need for individualized assessments of liability and harm. For example, in *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101 (5th Cir.1993), the court remanded the case to the district court with instructions to certify the requested (b)(2) class consisting of all former and current J.C. Penney employees whose pension benefits were reduced or eliminated as a result of the company's overestimation of Social Security benefits. *Id.* at 1103, 1106. The district court had denied certification, holding that the propriety of injunctive relief would "turn upon a consideration of the individual circumstances of each class member." *Id.* at 1104. The circuit court disagreed, stating:

> [Plaintiff] defines the class as including all current and former Penney employees "whose pension benefits have been, or will be, reduced or eliminated as a result of the overestimation of their Social Security ben-

efits." Penney asserts that this definition is hopelessly "circular," as the court must first determine whether an employee's pension benefits were improperly reduced before that person may be said to be a member of the class. This argument is meritless and, if accepted, would preclude certification of just about any class of persons alleging injury from a particular action. These persons are linked by this common complaint, and the possibility that some may fail to prevail on their individual claims [if brought as individual claims] will not defeat class membership.

*Id.* at 1105.

Similarly, the Third Circuit certified a class of children in the legal care and custody of Philadelphia's Department of Human Services ("DHS") who alleged that "systemic deficiencies prevent[ed] DHS from providing a variety of child welfare services legally mandated by the United States Constitution and by federal and state law." *Baby Neal,* 43 F.3d at 52. Despite the individual circumstances and needs of each plaintiff, the court reversed the district court's denial of a(b)(2) class stating that "where plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them, ... there is therefore no need for individualized determinations of the propriety of injunctive relief." *Id.* at 57. Moreover, the court found that "(b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Id.*

Here, the named plaintiffs are seeking money damages for themselves but are only seeking declaratory and equitable relief for the class they wish to represent. "The fact that the named plaintiffs are seeking damages on their own behalf does not make them inappropriate as class representatives."

*German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 555 (S.D.N.Y.1995). While plaintiffs are also seeking attorneys' fees, the overall relief requested is equitable. *See Martens v. Smith Barney, Inc.,* 181 F.R.D. 243, 260 (S.D.N.Y.1998) ("Money damages cannot be the predominant form of relief plaintiffs seek, ..., but can be part of an overall menu of relief that is predominantly equitable."). Because "general class descriptions based on the harm allegedly suffered by plaintiffs [are] acceptable in class actions seeking only declaratory and injunctive relief under Rule 23(b)(2)," *Wanstrath v. Time Warner Entm't Co., L.P.,* No. 93 Civ. 8538, 1997 WL 122815, at *3 (S.D.N.Y. Mar.17, 1997), plaintiffs' proposed class is sufficiently definite to warrant certification.[6]

## C. Numerosity

■ Rule 23(a) requires a finding that the number of plaintiffs makes joinder of all class members "impracticable." Impracticable, however, does not mean impossible. *See Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir. 1993). "Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." In fact, the Second Circuit has stated that a class of only forty members is presumptively sufficient. *See Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995).

■ In their Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Mem."), defendants argue that the total number of stops made by the SCU is not a useful number as plaintiffs have offered no statistics of the percentage of total stops made pursuant to defendants' allegedly unlawful policies. *See* Def. Mem. at 10. However, in their Reply, plaintiffs state that the Attorney General's Report found reasonable suspicion to be lacking in 23.2% of the stops documented by the SCU. *See* Reply Mem. at 5. Even in the absence of this

---

**6.** Nor is plaintiffs' proposed class overbroad because it may include persons other than black and Latino males. The class sought to be certified includes all persons subjected to suspicionless stops by the SCU. The fact that minorities who have been subjected to suspicionless stops based on their race and/or national origin can be seen as a subset of this wider class does not mean that the proposed class is overbroad. What it does mean is that this Court should consider whether to certify subclasses pursuant to Rule 23(c)(4).

proffered percentage, a court can use its common sense in determining numerosity. *See German,* 885 F.Supp. at 552 ("Precise quantification of the class members is not necessary because the court may make 'common sense assumptions' to support a finding of numerosity."). Thus, if this Court were to assume that 1% of the total stops made by the SCU in 1998 lacked reasonable suspicion, the total number of claims would be 270, which is well beyond the forty members the Second Circuit found sufficient in *Consolidated Rail Corp.* Accordingly, the size of the putative class is sufficiently large such that the joinder of all members is impracticable, favoring class litigation. *See Northwestern Nat'l Bank of Minneapolis v. Fox & Co.,* 102 F.R.D. 507, 511 (S.D.N.Y.1984).

### D. Commonality

 "The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A.,* 126 F.3d at 372. "Despite their similarity, however, commonality and typicality are distinct requirements under Rule 23." *Baby Neal,* 43 F.3d at 56 (citing *Hassine v. Jeffes,* 846 F.2d 169, 177 n. 4 (3d Cir.1988) (" '[C]ommonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff.")). The commonality requirement will be met if the named plaintiffs share a common question of law or fact with the grievances of the prospective class. *See In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 145, 166–67 (2d Cir.1987). The commonality requirement, however, does not mandate that all class members share identical claims. *See Baby Neal,* 43 F.3d at 56. Moreover, factual differences among the claims of the class members will not defeat certification. *See id.*

 While it is true that the individual circumstances of class members may differ, the claim is "that their injuries derive from a unitary course of conduct by a single system." *Marisol A.,* 126 F.3d at 377. Specifically, plaintiffs allege that defendants engaged in an unconstitutional pattern, practice or policy. *See Ventura v. New York City Health and Hosps. Corp.,* 125 F.R.D. 595, 600 (S.D.N.Y.1989) ("Several other courts in this Circuit similarly have held that the existence of individualized factors or variations does not preclude [a] finding of [the] existence of common questions where pattern, practice or policy exists.") (collecting cases). *See also Port Auth. Police Benevolent Assoc., Inc. v. Port Auth. of New York and New Jersey,* 698 F.2d 150, 154 (2d Cir.1983) (holding that certification had been improperly denied where plaintiffs challenged a practice of defendants, as opposed to defendants' conduct with respect to each individual plaintiff). The fact that the claims of the proposed class "stem from the same alleged unconstitutional conduct of the defendants" proves the existence of common questions of law or fact. *Wilson,* 1993 WL 280205, at *5.

In *Allman v. Coughlin,* 577 F.Supp. 1440, 1444 (S.D.N.Y.1984), a case alleging that the State's failure to train an emergency response team responsible for regaining control of the Westchester County Jail led to the injury of several inmates, the court found that common issues of fact and law predominated. While defendants argued that each inmate was treated individually, plaintiffs established "the possibility of systematic and indiscriminate violations of the inmates' rights, as well as the possibility of a gross failure on the part of the defendants to properly select, train, and supervise the [response team's] line officers." *Id.* This was deemed sufficient as the court framed the common issue of law as follows: "did whatever failures in selection, training, and supervision that may have occurred constitute, in and of themselves, violations of the inmates' constitutional rights because those failures led directly to the injuries and deprivations that are alleged?" *Id.* The common issue of fact was whether the selection, training, and supervision were adequate despite the fact that there were "some issues of fact pertaining only to individuals and to individual incidents." *Id.* Other courts have reached similar results. *See, e.g., Marisol A.,* 126 F.3d at 377 (commonality found even though each named plaintiff challenged a different aspect of the child welfare system); *Ventura,* 125 F.R.D. at 599–600 ("common issues of fact exist[ed] as to whether [defendant's] facilities

have conducted selective drug testing, based upon the race or national origin of the tested employee, in violation of employees' civil and constitutional rights").

In sum, because the injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members—namely suspicionless stops—the commonality requirement is satisfied.

### E. Typicality

■■■ Typicality requires that the claims of the class representatives be typical of those of the class and "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992). "The rule is satisfied, therefore, if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Marisol A.*, 929 F.Supp. at 691. "There is no requirement that the factual basis for the claims of all members of a purported class be identical." *Wilder v. Bernstein*, 499 F.Supp. 980, 992 (S.D.N.Y.1980). Furthermore, "[c]ommentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal*, 43 F.3d at 58 (citing 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 3.13 (3d ed.1992)).

■■■ Here, the claims of the named plaintiffs and the proposed class members arise from the same allegedly unlawful activity on the part of the SCU—namely suspicionless stops and frisks. Both the named plaintiffs and the class members will allege that these stops were made in violation of the Fourth Amendment because the officers lacked reasonable suspicion to make a stop. Accordingly, the claims of the named plaintiffs are typical of those of the class.

### F. Adequacy of Representation

■■■ The requirement that the named plaintiffs adequately represent the class involves a two-pronged inquiry. *First*, plaintiffs must demonstrate that "class counsel is qualified, experienced, and generally able to conduct the litigation." *In re Drexel Burnham*, 960 F.2d at 291. *Second*, class members must not have interests that are antagonistic to one another. *See id.*

Here, defendants have attacked both the adequacy of the class counsel and the class representatives. As to the former, defendants provide a litany of purported transgressions in an attempt to prove that class counsel is both incompetent and unethical.[7] *See* Def. Mem. at 18–19. While initially disconcerting, plaintiffs have provided adequate explanations for each alleged impropriety. *See* Reply Mem. at 9–10. In addition, the Court notes the considerable experience of plaintiffs' attorneys. In particular, The Center for Constitutional Rights has substantial experience in litigating civil rights class actions in the federal courts. And Debevoise & Plimpton has extensive resources and experience dealing with federal class action law suits. Aided by the capable hands of Jonathan C. Moore and Robert F. Van Lierop, class counsel is undoubtedly qualified and experienced to conduct this litigation.

As to the adequacy of the class representatives, defendants point out several character flaws including Daniels' lack of mental competence, Baskin's outstanding warrant for public consumption of alcohol, Bonner's false arrest and malicious prosecution claims, and the fact that the interest of the named plaintiffs in pursuing their equal protection claims

---

7. In this regard, defendants cite, *inter alia*, the following transgressions: counsel's simultaneous representation of a putative class of clients with claims potentially adverse to those of the named plaintiffs here in *Latino Officers Ass'n v. City of New York*, 99 Civ. 9568(LAK); improprieties regarding the use of the photo array; plaintiffs' inadequate responses to certain discovery requests; failure to guard against a possible breach of confidentiality; counsel's communications with their present clients; improper coaching; and failure to pay the *pro hac vice* fee. *See* Def. Mem. at 18–20.

may conflict with the interest of those class members pursuing only Fourth Amendment claims.[8]

As to the named plaintiffs' character flaws, Judge Peter K. Leisure of this Court aptly addressed this argument in a civil rights action brought by juveniles challenging the conditions at two centers for adolescent girls with emotional problems.

> If the courts prevent persons with questionable moral characters from acting as class representatives, [classes of] prisoners, mental patients, juvenile offenders or others capable of socially deviant behavior could never be certified. This is an unacceptable result. The fact that the named plaintiffs may be juvenile delinquents does not prevent this Court from certifying the class.

*Jane B. by Martin v. New York City Dep't of Soc. Servs.*, 117 F.R.D. 64, 71 (S.D.N.Y.1987). The minor infirmities cited by defendants do not disqualify the named plaintiffs from acting as class representatives.

 As to Bonner, it is well settled that the mere existence of individualized fact questions with respect to a named plaintiff's claims will not bar class certification. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir.2000). A putative class representative's claims will not be typical, however, if that representative will be faced with unique defenses. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) ("class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the

litigation"). While it is true that Bonner is also asserting false arrest and malicious prosecution claims, *see* Cmplt ¶¶ 150–52, these claims will not likely become the focus of this litigation. Rather, they present ancillary issues that must be resolved, but will not overshadow the primary claims in this litigation. Therefore, Bonner's "atypical" situation does not present the type of unique defenses that would likely cause prejudice to the other class members.[9] *See Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y.1989).

Finally, there is no conflict between those class members who would assert only a suspicionless stop and the named plaintiffs who are asserting a suspicionless stop based on racial profiling. Those members asserting that they were the victims of racial profiling may be seen as subclass of those who would assert only a suspicionless stop, regardless of the motive for that stop. *See infra* Part III.B. As the court in *Wilson v. Tinicum Township* explained:

> The classes of persons which plaintiffs here propose are challenging the same alleged illegal conduct of the defendants, namely, the unconstitutional policy of stopping, detaining, and searching cars and their occupants without cause or proper consent. In addition, the minority classes which plaintiffs propose allege that they have been targeted for special attention in implementing the alleged unconstitutional policy. The claims plaintiffs assert, therefore, involve a common central issue: whether the defendants engaged in violations of the proposed class members rights under the Fourth and Fourteenth Amend-

---

8. Defendants' other challenges to the adequacy of the class representatives are lacking in merit and not worthy of further discussion.

9. Nor do Daniels' alleged mental incompetence or Baskin's outstanding warrant disqualify them from serving as class representatives. Mental retardation is not an automatic disqualifier, even where the class does not consist of mentally retarded persons. *See Turner v. Diversified Adjustment Serv., Inc.* No. 00 Civ. 463, 2000 WL 748124, at *2 (N.D.Ill. May 31, 2000) (citing *Surowitz v. Hilton Hotels*, 383 U.S. 363, 366, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966)). Moreover, Daniels' deposition testimony illustrates that he is capable of understanding the central issues in

this litigation. *See* Reply Mem. at 8. Baskin's outstanding warrant also fails to disqualify him as a class representative as that warrant was issued in connection with an incident unrelated to the stops and frisks challenged here. *See Jane B.*, 117 F.R.D. at 71 ("The inquiry, then, into the representatives' personal qualities is not an examination into their moral righteousness, but rather an inquiry directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit."). Whether Baskin's outstanding warrant touches upon his credibility is an issue that will undoubtedly be fully explored upon cross-examination.

ments of the United States Constitution and the laws of the Commonwealth of Pennsylvania.

1993 WL 280205, at *5.

In short, both the class counsel and the putative class representatives are adequate to represent the proposed class.

## G. The *Galvan* Doctrine

■ In the seminal case of *Galvan v. Levine*, 490 F.2d 1255 (2d Cir.1973), the Second Circuit found class certification unnecessary where the State defendant, prior to judgment, withdrew the challenged rule and represented that it had no intention of reinstating it. The court explained that

> insofar as the relief sought is prohibitory, an action seeking declaratory or injunctive relief against state officials on the ground of unconstitutionality of a statute or administrative practice is the archetype of one where class action designation is largely a formality, at least for the plaintiffs. As we have recently noted in *Vulcan Society v. Civil Service Comm'n*, [490] F.2d 387, 399 (1973), what is important in such a case for the plaintiffs or, more accurately, for their counsel, is that the judgment run to the benefit not only of the named plaintiffs but of all others similarly situated, ..., as the judgment did here. The State has made clear that it understands the judgment to bind it with respect to all claimants; indeed even before entry of the judgment, it withdrew the challenged policy even more fully than the court ultimately directed and stated it did not intend to reinstate the policy.

*Id.* at 1261 (citations omitted). The Second Circuit has subsequently re-affirmed the *Galvan* doctrine on a number of occasions. *See, e.g., Davis v. Smith*, 607 F.2d 535, 540 (2d Cir.1978) ("Where retroactive monetary relief is not at issue and the prospective benefits of declaratory and injunctive relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment, a district court may decline certification."); *Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir.1980) (class certification held to be "largely a formality" where State defendants

have explicitly indicated a willingness to comply with the court's order); *Berger v. Heckler*, 771 F.2d 1556 (2d Cir.1985) (class certification unnecessary where defendant agreed to the enforcement of a decree in favor of nonparties).

A number of lower courts have also applied *Galvan* in denying certification. In *Feld v. Berger*, 424 F.Supp. 1356, 1363 (S.D.N.Y. 1976), Judge Edward Weinfeld deemed class certification superfluous for the following reasons:

> The defendants are public officials charged with compliance with and enforcement of federal as well as state laws. The Court assumes these public officials, mindful of their responsibilities, will apply the determination here made equally to all persons similarly situated. [I]t would be unthinkable that the ... defendants would insist on other actions being brought to vindicate the same rights at issue here.

*Id.* at 1363 (internal quotation marks and citations omitted, alteration in original). *See also Kow v. New York City Hous. Auth.*, 92 F.R.D. 73, 74 (S.D.N.Y.1981) ("Where ... there is no reason to doubt that the defendants would accord to all members of the proposed class the benefits of any judgment accorded the plaintiff, class certification has been denied."); *Denenberg v. Blum*, 93 F.R.D. 131, 132 (S.D.N.Y.1982) (class certification unnecessary where the "benefits sought for the putative class by this suit would self-evidently inure to all members of the class similarly situated"); *Lincoln CERCPAC v. Health and Hosps. Corp.*, 920 F.Supp. 488 (S.D.N.Y.1996) ("If plaintiffs are granted their relief, it will affect all former and future CERC patients irrespective of whether they are included in a class action."); *Green v. Borg–Warner Protective Servs. Corp.*, No. 95 Civ. 10419, 1998 WL 17719, at *4 (S.D.N.Y. Jan. 16, 1998) ("The declaratory and injunctive relief sought against the State and Municipal defendants would make class action designation largely a formality since the relief sought, if warranted, would confer a benefit on all persons similarly situated without any class designation."); *Langer v. New York State Office of Court Admin.*, No. 98 Civ. 0413E, 1998 WL 799153, at *6

(W.D.N.Y. Nov. 13, 1998) ("The doctrine that class certification is unnecessary in these circumstances arises out of the presumption that the State and its agents will not act to enforce against any person a regulation which has been found and declared to violate the Constitution, whether or not that person participated in the action which resulted in such declaration.").

On the other hand, a number of lower courts have distinguished *Galvan* and granted class certification. In *Blecher v. Department of Hous. Pres. and Dev. of the City of New York*, No. 92 Civ. 8760, 1994 WL 144376 (S.D.N.Y. Apr. 19, 1994), Judge Charles S. Haight addressed this issue.

> The Second Circuit has held that one seeking class action status under Rule 23(b)(2) not only must meet the minimum prerequisites for a class action under Rule 23(a), but also must present additional reasons for obtaining certification of the class under 23(b) and 23(c).

> \* \* \*

> Courts have focused on four factors in determining whether class certification is necessary under Galvan. First, notwithstanding the presumption that government officials will abide by a court's decision as to similarly situated individuals, an affirmative statement from the government defendant that it will apply any relief across the board militates against the need for class certification.

> \* \* \*

> Second, withdrawal of the challenged action or non-enforcement of the challenged statute militates against the need for class certification.

> \* \* \*

> Third, the type of relief sought can affect whether class certification is necessary. Courts have found that where the relief sought is merely a declaration that a statute or policy is unconstitutional, denial of class certification is more appropriate than where plaintiffs seek complex, affirmative relief.

> \* \* \*

> Fourth, courts also consider whether the claims raised by plaintiffs are likely to become moot, making class certification necessary to prevent the action from becoming moot.

1994 WL 144376, at \*4–5 (citations omitted).

Many cases distinguish *Galvan* on the basis of the type of relief sought—namely prohibitory or affirmative. *See, e.g., Folsom v. Blum*, 87 F.R.D. 443, 445 (S.D.N.Y.1980) ("[T]he additional remedy that plaintiff seeks, notification to all class members of the procedure for recouping past benefits, requires a preliminary grant of class status."); *Koster v. Perales*, 108 F.R.D. 46, 54 (E.D.N.Y.1985) ("[T]he classic case where individual relief benefits a class, making certification unnecessary, is where a law is held unconstitutional. Here, however, the plaintiffs seek to enjoin a practice or policy of alleged unlawful activity."); *Jane B.*, 117 F.R.D. at 72 (*Galvan* found inapplicable where plaintiffs sought relief that would require defendants to take affirmative steps to remedy constitutional violations and implement standards that comport with federal and state law); *Loper v. New York City Police Dep't*, 135 F.R.D. 81 (S.D.N.Y.1991) (class certified where Police Department states that it would consider itself bound with respect to all class members only after all appeals had been exhausted); *Connecticut State Dep't of Soc. Servs. v. Shalala*, No. 99 Civ.2020, 2000 WL 436616, at \*2 (D.Conn. Feb. 28, 2000) (collecting cases holding that *Galvan* extends only to actions in which prohibitory, but not mandatory, relief is sought).

The distinction between prohibitory and affirmative relief is somewhat illusory. If the relief sought automatically benefits the putative class members, there is no reason why *Galvan* should not apply. What matters is whether class members will automatically benefit without any additional action on their part. Thus, the more important inquiry is the level of commitment expressed by the defendants.

In *Cutler v. Perales*, 128 F.R.D. 39 (S.D.N.Y.1989), the putative class consisted of all New York City Medicaid applicants

who failed to receive timely final administrative action as required by federal regulations. *Id.* at 41. The court certified the class, stating

> defendants have made no representation of willingness to change internal procedures to ensure compliance with a ruling for plaintiff. Because this litigation challenges a wide range of practices divided between two government agencies, enforcement might be difficult. In addition, most putative class members are either old or infirm and could not as effectively bring separate enforcement actions. Therefore, a class action is preferable . . . .

*Id.* at 47. *See also Brown v. Giuliani,* 158 F.R.D. 251, 269 n. 23 (E.D.N.Y.1994) (class certification necessary where defendants, who had a history of failing to abide by court orders, did not agree that underlying judgment against them would bind them with respect to all potential claimants); *Shalala,* 2000 WL 436616, at *3 (certification granted where defendant did not formally commit to granting any class-wide relief by offering a clear stipulation to that effect).

Here, defendants have not expressed a willingness to apply a ruling by this Court to all those similarly situated to the named plaintiffs. While defendants have denied commonality at the class certification stage, this does not prohibit them from subsequently agreeing to give any judgment class-wide effect. *But see Bishop v. New York City Dep't of Hous. Pres. and Dev.,* 141 F.R.D. 229, 241 (S.D.N.Y.1992) (where the court, without explanation or discussion, found it "plainly inconsistent for Defendants to argue that any relief granted in connection with this action will be applied to benefit every member of the class, while at the same time [ ] contest[ing] the existence of commonality and typicality."). Here, a stipulation by defendants would assure the Court that there would be no problems with class-wide enforcement in the absence of a certified class. If this were to occur, reconsideration of class certification would be appropriate.

## IV. CONCLUSION

For the foregoing reasons, the class proposed by the plaintiffs is hereby certified

under Rules 23(a) and 23(b)(2). A conference is scheduled for February 2, 2001 at 3:00 p.m.

SO ORDERED: